T.C. Memo. 2007-101


UNITED STATES TAX COURT


GARY W. McDONOUGH, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15239-04.               Filed April 25, 2007.


Wendy S. Pearson, Terri A. Merriam, Jennifer A. Gellner,

Jaret R. Coles, Asher B. Bearman, and Brian G. Isaacson, for

petitioner.[1]

Nhi T. Luu and Catherine Caballero, for respondent.

---

[1] Wendy S. Pearson (Pearson), Terri A. Merriam (Merriam), Jennifer A. Gellner (Gellner), and Jaret R. Coles entered their appearances by subscribing the petition commencing this case. See Rule 24(a). (Unless otherwise indicated, Rule references are to the Tax Court Rules of Practice and Procedure, and section references are to the applicable versions of the Internal Revenue Code (Code).) Asher B. Bearman (Bearman) and Brian G. Isaacson entered their appearances on July 18, 2005, and Aug. 15, 2006, respectively. Pearson, Gellner, and Bearman withdrew from the case on Oct. 16, Nov. 14, and Nov. 15, 2006, respectively.

## MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  This is an affected items proceeding arising from disallowed partnership losses claimed for 1989 and 1991 by Timeshare Breeding Service 1989-1, J.V. (TBS 89-1), a cattle partnership organized, promoted, and operated by Walter J. Hoyt III (Hoyt).[2]  Petitioner was a partner in TBS 89-1, and he reported his distributive shares of its reported losses on his 1989 and 1991 Federal income tax returns.  Respondent determined that petitioner is liable for the following accuracy-related penalties with respect to his reporting of those disallowed losses:[3]

| Year | Accuracy-related penalties | |
|------|----------------|----------------|
|      | Sec. 6662(a) | Sec. 6662(h) |
| 1989 | -0- | $3,577.20 |
| 1991 | $5,669.40 | -0- |

---

[2] Respondent's disallowance of these losses was upheld in Durham Farms #1, J.V. v. Commissioner, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003).

[3] For 1989, respondent determined that the accuracy-related penalty under sec. 6662(h) applied to the portion of petitioner's underpayment resulting from a disallowed depreciation deduction claimed by TBS 89-1.  For 1991, respondent determined that petitioner had an underpayment attributable to one or more of the following under sec. 6662(a) and (b):  (1) Negligence or disregard of rules or regulations; (2) substantial understatement of income tax; (3) substantial valuation misstatement.  Because respondent in his posttrial opening brief addresses only the first two elements, we consider respondent to have waived any argument that petitioner's underpayment for 1991 was attributable to a substantial valuation misstatement.

Petitioner petitioned the Court on August 23, 2004, to redetermine that determination.

On November 5, 2004, respondent filed with the Court an answer to petitioner's petition. The answer alleges that in lieu of the determined amounts, petitioner is liable for a $3,029.60 accuracy-related penalty under section 6662(h) for 1989 and a $5,664.80 accuracy-related penalty under section 6662(a) for 1991. On April 18, 2006, respondent amended his answer to allege as an alternative to the accuracy-related penalty under section 6662(h) for 1989 that petitioner is liable for a $1,514.80 accuracy-related penalty under section 6662(a) for negligence or disregard of rules or regulations, see sec. 6662(b)(1), and/or for substantial understatement of income tax, see sec. 6662(b)(2).

We decide whether petitioner is liable for the disputed accuracy-related penalties. We hold that petitioner is liable for a section 6662(h) accuracy-related penalty for 1989 and a section 6662(a) accuracy-related penalty for 1991, both in the amounts alleged by respondent in his answer.[4]

---

[4] At the outset, we note that three Courts of Appeals have affirmed prior decisions of this Court holding that other investors in Hoyt partnerships were liable for accuracy-related penalties for negligence under sec. 6662(a) and (b)(1). See Hansen v. Commissioner, 471 F.3d 1021 (9th Cir. 2006), affg. T.C. Memo. 2004-269; Mortensen v. Commissioner, 440 F.3d 375 (6th Cir. 2006), affg. T.C. Memo. 2004-279; Van Scoten v. Commissioner, 439 F.3d 1243 (10th Cir. 2006), affg. T.C. Memo. 2004-275.

FINDINGS OF FACT

The parties filed with the Court stipulations of fact and accompanying exhibits. The stipulated facts are found accordingly. When the petition was filed, petitioner resided in Westminister, California.

1. Petitioner

Petitioner was born in or about 1949. He graduated from high school and completed approximately 2-1/2 years of further education mostly in business administration and fire science. He has never taken an accounting or tax course.

In 1972, petitioner began working as a firefighter for the Los Angeles Fire Department (LAFD). He was promoted to captain in 1986, and he held that position for 6 years. In 1992, he began working for the LAFD in its Internal Affairs Department. In that capacity, he investigated suspect individuals who worked for the fire department.

Throughout the relevant years, petitioner has had limited experience with cattle ranching. He has worked sporadically on some ranches branding and castrating cattle and bulls, and he has occasionally helped a professional rodeo association set up and run its rodeos. He has never worked in a business office of a cattle ranch, and he has no experience with cattle valuation.

2. Hoyt and His Organization

From about 1971 through 1998, Hoyt organized, promoted, and operated as a general partner various cattle breeding partnerships. Three of the partnerships were Durham Shorthorn Breed Syndicate 1987-C J.V. (DSBS 87-C), Timeshare Breeding Service J.V. (TBS), and TBS 89-1. Hoyt organized, marketed, promoted, and operated all of his partnerships in essentially the same fashion. Among other things, Hoyt was responsible for and directed the preparation of each partnership's tax returns, and he typically signed and filed each of those returns.

3. Petitioner's Involvement With the Hoyt Partnerships

In or about 1986, petitioner heard about the Hoyt partnerships from his fellow firefighters at the LAFD. Petitioner knew that 12 of his close coworkers either were considering participating in a Hoyt partnership or had participated in a Hoyt partnership. Petitioner knew that two of those coworkers had participated in one or more of the Hoyt partnerships for as long as 10 years.

In 1988, petitioner decided to participate in some of the Hoyt partnerships with an intent to acquire a tax shelter and to generate funds for his retirement. Previously, in 1987 or 1988, petitioner had visited Hoyt's main office in Elk Grove, California, and he had toured Hoyt's facilities and ranches in Burns, Oregon. During his visit and tour, petitioner saw land

and equipment typically associated with ranches. Petitioner did not see (or ask to see) any record pertaining to a Hoyt partnership.

On July 15, 1988, petitioner signed a four-page document memorializing his intent to buy two units in TBS at a total cost of $7,000. The document (TBS document) included sections entitled "SUBSCRIPTION AGREEMENT AND SIGNATURE PAGE", "CERTIFICATION", "POWER OF ATTORNEY", "FILING ACKNOWLEDGEMENT", and "PARTNERSHIP AGREEMENT", and it referenced a section in the partnership agreement entitled "Risk Factors". The document stated that petitioner, as a signer of the document, "recognizes that even though the Partnership has a four year history of operations and earnings, their [his] investment therein is a speculative venture, and if they elect [he elects] to participate, they [he] may lose the total amount of their [his] investment." Petitioner did not seek independent professional advice as to the TBS document before signing it, opting instead to rely upon the words and actions of his coworkers as to their participation in one or more Hoyt partnerships. Later, petitioner purchased interests in DSBS 87-C and TBS 89-1, without signing any partnership document as to those purchases. Petitioner knew at the time of his purchases that the Hoyt partnerships advertised that his participation in a Hoyt partnership allowed him to claim refunds of Federal income tax,

75 percent of which he had to give to the Hoyt organization and 25 percent of which he could keep.

Petitioner received promotional materials from the Hoyt organization, which he showed to other firemen who were Hoyt participants but did not take to an attorney independent of the Hoyt organization. One of those documents was similar to a brochure entitled "The 1,000 lb. Tax Shelter". That brochure explained that the Hoyt partnerships were designed to provide profits over time and emphasized that the primary return on investment was realized through tax savings. The brochure indicated that the benefit of participating in a Hoyt partnership was that participants could obtain refunds of Federal income tax paid in the previous 3 years by amending their returns for those years so as to claim a carryback of investment tax credits generated by the partnership. The brochure stated that each partner had to pay 75 percent of the tax refunds to the Hoyt organization as an investment in the cattle but could keep the remaining 25 percent as a 30-percent return on investment. The brochure stated that the Hoyt organization would prepare each partner's tax returns, and

> would assist the Partners in claiming all the tax savings available to them first, before entering the Partnership numbers. If a Partner needs more or less Partnership loss any year, it is arranged quickly within the office, without the Partner having to pay a higher fee while an outside preparer spends more time to make the arrangements.

The brochure discussed the potential of audits by the Internal Revenue Service and stated that the Commissioner would brand the Hoyt partnerships "an abuse" and would subject the partnerships to "automatic" and "constant" audit. The brochure stated the Hoyt organization alone should be trusted to prepare each partner's tax returns.

From July 1, 1988, through September 30, 1992, petitioner paid the Hoyt organization the following amounts on the accompanying dates:

| Date of Payment | Amount |
|-----------------|--------|
| July 1, 1988 | $7,000 |
| Jan. 4, 1991 | 6,000 |
| Dec. 17, 1991 | 4,000 |
| Dec. 17, 1991 | 5,000 |
| Sept. 2, 1992 | 4,785 |
| | 26,785 |

4. Petitioner's Federal Income Tax Returns

Petitioner's 1988, 1989, 1990, and 1991 Federal income tax returns were prepared by tax preparation entities operated by Hoyt. Petitioner provided those entities with his personal information, such as wages, interest, dividends, mortgage interest, and real estate taxes, and the Hoyt organization provided the tax preparers with the amounts of losses and other tax attributes to be reported as distributed from the Hoyt partnerships. Petitioner signed and filed his 1988, 1989, 1990, and 1991 tax returns on the following dates:

| Year of Tax Return | Date Signed | Date Filed |
|---|---|---|
| 1988 | Apr. 27, 1989 | May 1, 1989 |
| 1989 | June 1, 1990 | June 4, 1990 |
| 1990 | June 20, 1991 | June 24, 1991 |
| 1991 | Sept. 30, 1992 | Oct. 2, 1992 |

Petitioner did not make any meaningful inquiry to find a tax professional independent of the Hoyt organization to prepare or review the Hoyt organization's preparation of those returns.

Petitioner's 1988 through 1991 tax returns reported the following relevant items:

| | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| Wages | $69,612 | $71,538 | $94,995 | $99,979 |
| Taxable interest | 449 | 958 | 1,129 | 2,030 |
| Refund of State and local income taxes | 843 | 3,694 | 1,789 | 3,173 |
| Capital gains (losses) | 5,311 | (3,000) | 308 | -0- |
| Farm income | -0- | -0- | -0- | 25,094 |
| Losses from Hoyt partnerships | 40,414 | 31,069 | 55,941 | 92,961 |
| Losses from other partnerships | -0- | 524 | 2,413 | 2,857 |
| Total income | 35,801 | 41,597 | 39,867 | 34,458 |
| Tax liability | 664 | 1,601 | 1,189 | 17 |
| Withholdings | 11,378 | 3,024 | 5,039 | 4,070 |
| Refund | 10,714 | 1,423 | 3,850 | 4,053 |

The losses reported as flowing from the Hoyt partnerships were broken down as follows:

| Partnership | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| TBS | $1,424 | $3,560 | $3,560 | -0- |
| DSBS 87-C | 38,990 | -0- | 18,810 | -0- |
| TBS 89-1 | -0- | [1]27,509 | 33,571 | [2]$92,961 |
| Total | 40,414 | 31,069 | 55,941 | 92,961 |

[1] This partnership loss was attributable to a depreciation adjustment on property placed in service after 1986.

[2] This partnership loss was further broken down as follows:  Ordinary loss of $59,179 and a special allocation deduction of $33,782 for legal fees.

Petitioner never asked the Hoyt organization to let him see any record relating to a partnership for which petitioner claimed losses for 1988 and 1991, and petitioner never contacted the Hoyt organization to ask questions or request records substantiating the amounts of partnership losses reported on his 1989 and 1991 tax returns.

Petitioner's 1988, 1989, 1990, and 1991 tax returns included Forms 8271, Investor Reporting of Tax Shelter Registration Number, listing a number of tax shelters including TBS (for 1988, 1989, and 1990), DSBS 87-C (for 1988 and 1990), and TBS 89-1 (for 1989, 1990, and 1991).  Petitioner's 1991 return also included a one-page document that he entitled "Material Participation Statement".  Petitioner signed that statement on September 30, 1992, asserting therein that he had spent 145 hours in 1991 materially participating in a business activity of his named "Gary McDonough Co."  Petitioner's 1991 return also included two Schedules F, Profit or Loss from Farming, reporting farm income of $1,800 and $23,294 from a "SALE OF COW" and "BREEDING VALUE PRODUCTION AND SALES", respectively, and reporting no related farm expense.  The $23,294 stemmed from petitioner's participation in TBS 89-1 and appeared on his 1991 Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc., from TBS

89-1. The $1,800 may or may not have been related to petitioner's participation in TBS 89-1.

For 1988, 1989, 1990, and 1991, petitioner received Federal income tax refunds as follows:

| Year | Refund Amount | Date Refund Issued |
|------|---------------|--------------------|
| 1988 | $10,714 | May 29, 1989 |
| 1989 | 1,423 | July 9, 1990 |
| 1990 | 3,850 | July 29, 1991 |
| 1991 | 4,053 | Nov. 2, 1992 |

5. Documents From the Internal Revenue Service

Before signing his 1991 tax return, petitioner received notices of beginning of administrative proceeding (NBAP) informing him that the Commissioner was examining the 1988, 1989, and 1990 taxable years of DSBS 87-C. Petitioner never took any of the NBAPs to a tax professional independent of the Hoyt organization, e.g., to inquire about its significance. Before signing his 1991 tax return, petitioner also received two letters from the Internal Revenue Service, containing information regarding material participation and section 469.

6. The Bales Memorandum Opinion

The case of Bales v. Commissioner, T.C. Memo. 1989-568, pertained to Hoyt cattle partnerships (not including TBS 89-1) and their 1974 through 1981 taxable years. The Court in Bales decided that those partnerships were not shams. After Bales was decided, Hoyt promoted the Hoyt partnerships to prospective participants by referring to the case.

Petitioner obtained a copy of the <u>Bales</u> Memorandum Opinion from another fireman.  Petitioner read that Memorandum Opinion, and he read other related materials provided by Hoyt.  Petitioner never took the <u>Bales</u> Memorandum Opinion to a tax professional independent of the Hoyt organization for advice.

7.  <u>Durham Farms #1</u>

On April 18 and August 15, 1994, respectively, respondent mailed to petitioner an NBAP and notice of final partnership administrative adjustment (FPAA) relating to the 1989 taxable year of TBS 89-1.  On May 8, 1995, respondent issued to Hoyt, as the tax matters partner (TMP) of TBS 89-1, an FPAA for the 1991 taxable year of TBS 89-1.  In response to these FPAAs, Hoyt, as TMP of TBS 89-1, petitioned the Court on October 14, 1994, and August 4, 1995.  The Court docketed the respective cases at our docket Nos. 18707-94 and 14712-95.

The Court decided the disputed issues underlying those petitions in a partnership proceeding.  See <u>Durham Farms #1, J.V. v. Commissioner</u>, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003).  The Court held that various partnerships, including TBS 89-1, did not receive the benefits and burdens of ownership of the cattle in dispute there and were not entitled to the claimed partnership deductions and losses.  On April 24, 2001, the Court entered decisions in <u>Timeshare Breeding Serv. 1989-1, J.V. v. Commissioner</u>, docket No. 18707-94, and <u>Timeshare</u>

Breeding Serv. 1989-1, J.V. v. Commissioner, docket No. 14712-95.

The decision for 1989 ordered and decided the following:

| Partnership Item | As Reported | As Determined |
| --- | --- | --- |
| Depreciation expense | $1,056,720 | -0- |
| Depreciation after 1986 | 1,056,720 | -0- |

The decision for 1991 ordered and decided the following:

| Partnership Item | As Reported | As Determined |
| --- | --- | --- |
| Farm income | -0- | -0- |
| Depreciation expense | $555,199 | -0- |
| Board expenses | 1,983,470 | -0- |
| Loss to drought | 237,325 | -0- |
| Interest expense | -0- | -0- |
| Net self-employment income | (2,750,837) | -0- |
| Other deductions | 14,578 | -0- |
| Gain under section 1231 | 11,686 | -0- |
| Guaranteed payments | -0- | -0- |

Respondent determined initially that these decisions increased petitioner's 1989 and 1991 income by $32,225 and $100,241, respectively.  On May 13, 2002, respondent reflected those increases by assessing against petitioner $8,943 and $28,347 of deficiencies for 1989 and 1991, respectively, as computational adjustments under section 6231(a)(6).  On May 26, 2004, respondent issued to petitioner the relevant affected items notices of deficiency; those notices stated that petitioner was liable for the disputed accuracy-related penalties as determined on the basis of the deficiencies assessed as computational adjustments.  On September 1, 2004, respondent notified petitioner that respondent had revised his computations of the increases to petitioner's 1989 and 1991 income, and thus the

amounts that should have been assessed as deficiencies related thereto, to reflect his recent finding that the aforementioned decisions increased petitioner's income in the respective years only by $28,059 and $100,226.[5]  On October 25, 2004, respondent abated $1,369 and $23 of the assessed computational adjustments for 1989 and 1991, respectively, thus reducing the assessed amounts to $7,574 and $28,324, respectively.  Those reductions led to respondent's allegation in the answer that the accuracy-related penalties for 1989 and 1991 equal $3,029.60 and $5,664.80, respectively ($7,574 x .40 = $3,029.60; $28,324 x .20 = $5,664.80).

OPINION

1.  Burden of Production

Petitioner argues that section 7491(c) applies to place upon respondent the burden of production as to the accuracy-related penalties.[6]  Section 7491(c) was added to the Code by the

---

[5] The letters also explained that respondent was reducing petitioner's self-employment tax for 1991 to reflect a correction made in the calculation of self-employment income.

[6] Sec. 7491(c) provides:

   SEC. 7491(c).  Penalties.--Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.

In order for the Commissioner to satisfy that burden of
(continued...)

Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(a), 112 Stat. 726. The amendment is effective for "court proceedings arising in connection with examinations commencing after" July 22, 1998. Id. sec. 3001(c)(1), 112 Stat. 727. While the parties agree that respondent started examining TBS 89-1 before the effective date of section 7491(c), the parties dispute whether respondent's examination of TBS 89-1 is the relevant examination for purposes of establishing the date on which respondent started his examination as to the affected items at issue. According to respondent, the affected items were determined "in connection with" the examination of TBS 89-1 and, hence, the date on which that examination began is the date that is used to test whether section 7491(c) applies to this case. According to petitioner, respondent's determination of the affected items resulted from a separate, non-partnership-level examination of petitioner personally and, hence, the starting date of the later examination is the date to be used to determine the applicability of section 7491(c). Notwithstanding which party bears the burden of

---

6(...continued)
production, the record must establish that it is appropriate to impose the relevant penalty, addition to tax, or additional amount. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). The burden of production and proof remain on the taxpayer to establish that the penalty, addition to tax, or additional amount does not apply because of reasonable cause, substantial authority, or the like. Id.; see also H. Conf. Rept. 105-599, at 241 (1998), 1998-3 C.B. 747, 995.

production in this case, however, our review of the record leads us to the same conclusion; i.e., that petitioner is liable for the section 6662(h) accuracy-related penalty for 1989 and the section 6662(a) accuracy-related penalty for 1991, both in the amounts respondent alleged in his answer. Thus, we need not and do not discuss any further the parties' dispute as to which of them bears the burden of production in this case.

2. <u>Sections 6662 and 6664</u>

    a. <u>Overview</u>

Section 6662 provides that a taxpayer may be liable for a 20-percent accuracy-related penalty on the portion of an understatement of income tax attributable to (among other things) negligence or disregard of rules or regulations or a substantial understatement of income tax. See sec. 6662(a) and (b)(1) and (2). Section 6662(h)(1) increases the amount of the section 6662(a) accuracy-related penalty to 40 percent in the case of gross valuation misstatements. Section 6664(c)(1) provides that no accuracy-related penalty under section 6662 applies to the extent that the taxpayer has reasonable cause for an underpayment of tax and acted in good faith with respect to that underpayment.

    b. <u>Negligence/Disregard of Rules or Regulations</u>

For purposes of section 6662(a), negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code or to exercise ordinary and reasonable

care in the preparation of a tax return; disregard includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); see also Hansen v. Commissioner, 471 F.3d 1021, 1028 (9th Cir. 2006), affg. T.C. Memo. 2004-269. Negligence has also been defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under similar circumstances. Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989). Negligence includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly, sec. 1.6662-3(b)(1), Income Tax Regs., and negligence is strongly indicated where the taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return which would seem to a reasonable and prudent person to be too good to be true under the circumstances, sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person, Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982), and courts generally look both to the reasonableness of the underlying investment and to the taxpayer's position taken on the return in evaluating whether the taxpayer was negligent, Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217. When an investment has such obviously

suspect tax claims as to put a reasonable taxpayer under a duty of inquiry, a good faith investigation of the underlying viability, financial structure, and economics of the investment is required.  Roberson v. Commissioner, T.C. Memo. 1996-335 (citing LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), and Horn v. Commissioner, 90 T.C. 908, 942 (1988)), affd. without published opinion 142 F.3d 435 (6th Cir. 1998).

   c.  Substantial Understatement of Income Tax

An understatement of income tax is substantial if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1).  An understatement is the excess of the amount of tax required to be shown on the return over the amount of tax actually reported on the return.  Sec. 6662(d)(2).

   d.  Gross Valuation Misstatements

Section 6662(h) provides that a taxpayer may be liable for a 40-percent penalty on any portion of an underpayment of tax attributable to gross valuation misstatements.  No penalty is imposed under that section, however, unless the portion exceeds $5,000.  Sec. 6662(e)(2).  A gross valuation misstatement denotes any substantial valuation misstatement, as determined under

section 6662(e), by substituting "400 percent" for "200 percent". Sec. 6662(h)(2)(A).  Pursuant to section 6662(e)(1)(A), as read without the referenced substitution of text, a substantial valuation misstatement occurs if "the value of any property (or the adjusted basis of any property) claimed on any return * * * is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis".  After the referenced substitution of text, a gross valuation misstatement occurs when the value or basis claimed on a return is 400 percent or more of the correct value or basis.

    e.  <u>Reasonable Cause and Good Faith</u>

No penalty is imposed under section 6662 to the extent that the taxpayer had reasonable cause for the underpayment of tax and acted in good faith with respect to the underpayment.  Sec. 6664(c)(1); see also <u>Hansen v. Commissioner</u>, <u>supra</u> at 1029.  The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.; see also <u>Hansen v. Commissioner</u>, <u>supra</u> at 1028-1029.  The extent of the taxpayer's efforts to ascertain his proper tax liability is generally the most important factor.  Sec. 1.6664-4(b)(1), Income Tax Regs.; see also <u>Hansen v. Commissioner</u>, <u>supra</u> at 1028-1029.

Reasonable cause and good faith under section 6664(c) may be established where there is an honest misunderstanding of fact or law that is reasonable in the light of all facts and circumstances, including the experience, knowledge, and education of the taxpayer.  Sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause and good faith are not necessarily established by reliance on facts that, unknown to the taxpayer, are incorrect.  Id.

3.  Applicability of the Accuracy-Related Penalties

    a.  Gross Valuation Misstatement

In Durham Farms #1, J.V. v. Commissioner, T.C. Memo. 2000-159, the Court held that TBS 89-1 did not receive the benefits and burdens of ownership of the cattle in dispute there and was not entitled to the partnership deductions and losses claimed with respect thereto.  The Court's decision stated that the partnership's "Depreciation Expense" and "Depreciation after 1986", each of which was reported as $1,056,720, were both zero. The disallowance of those items resulted in a computational adjustment (and tax understatement) for 1989 of $7,574.  Because petitioner's adjusted basis for the depreciation expense deduction also was zero, the underpayment for 1989 resulting from the disallowance of petitioner's partnership loss from TBS 89-1, all of which was attributable to a disallowed depreciation expense, is attributable to an overstatement of bases of more

than 400 percent of the amounts determined to be the correct adjusted bases. See <u>Keller v. Commissioner</u>, T.C. Memo. 2006-131; <u>Jaroff v. Commissioner</u>, T.C. Memo. 2004-276; see also <u>Zirker v. Commissioner</u>, 87 T.C. 970 (1986). In that petitioner's resulting underpayment of tax for 1989 exceeded $5,000, we conclude that petitioner's underpayment of 1989 tax resulting from the disallowance of his reported cost bases and depreciation deduction was attributable to a gross valuation misstatement of over $5,000. See <u>Massengill v. Commissioner</u>, 876 F.2d 616 (8th Cir. 1989), affg. T.C. Memo. 1988-427; <u>Zirker v. Commissioner</u>, <u>supra</u>; <u>Jaroff v. Commissioner</u>, <u>supra</u>. We thus also conclude that petitioner is liable for the 40-percent accuracy-related penalty under section 6662(h) for 1989, rather than the 20-percent accuracy-related penalty set forth in section 6662(a), unless he meets the section 6664(c) exception for reasonable cause and good faith, in which case no penalty will apply.

Petitioner's posttrial briefs contain no discussion of <u>Massengill</u>, <u>Zirker</u>, or <u>Jaroff</u>, arguing instead that <u>Gainer v. Commissioner</u>, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416, and <u>Todd v. Commissioner</u>, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987), establish that the accuracy-related penalty under section 6662(h) cannot apply if an asset such as the cattle at issue does not exist. We disagree with petitioner's argument. The deductions in the two cases

petitioner relies on were disallowed because the relevant assets were not placed in service during the years that were the subject of those cases; the disallowance did not result from an asset's valuation or basis.  Here, valuation or basis was a deciding factor in determining whether the benefits and burdens of ownership passed to TBS 89-1.  Moreover, as we stated in Keller v. Commissioner, supra, in rejecting an argument similar to that of petitioner:

> If we accept petitioner's assertion that he never received the benefits and burdens of ownership of the cattle, or that the cattle never existed, then his bases in the cattle would be zero.  See Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986) (finding that no actual sale of cattle took place and the correct adjusted basis of cattle was zero); Massengill v. Commissioner, T.C. Memo. 1988-427 (same as Zirker), affd. 876 F.2d 616 (8th Cir. 1989).  This conclusion is supported by petitioner's concession that he was not entitled to cost basis or depreciation deductions.  If petitioner's correct bases are zero, then the bases claimed on his returns are considered to be 400 percent or more of the correct amount, and are thus gross valuation misstatements.  See sec. 1.6662-5(g), Income Tax Regs.; see also Zirker v. Commissioner, supra at 978-979.

b.  Negligence/Disregard of Rules or Regulations

Respondent alleged in his answer that petitioner was liable for 1991 for an accuracy-related penalty under section 6662(a) because his underpayment of tax for that year was attributable to negligence or disregard of rules or regulations.  Petitioner argues that he is not liable for such an accuracy-related penalty because he acted reasonably in joining TBS 89-1 and in monitoring

his participation in that venture.  We hold that petitioner was negligent both in participating in TBS 89-1 and in claiming on his 1991 return that he had a loss attributable to that participation.

Before joining TBS 89-1, petitioner had limited education and practical experience with regard to cattle ranching, and he had no experience with cattle valuation.  Nonetheless, before joining TBS 89-1, petitioner sought no independent professional advice on the legitimacy of TBS 89-1, opting instead to join that venture on the basis of his conversations with his colleagues at work.  Generally, a taxpayer is required to have made a reasonable inquiry into the validity of a questionable tax shelter benefit in order not to be liable for an accuracy-related penalty for negligence.  See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Zmuda v. Commissioner, 731 F.2d at 1422; cf. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Petitioner has failed that requirement.  Accord Hansen v. Commissioner, 471 F.3d at 1029-1030 (in the setting of a "highly suspicious" investment in a Hoyt venture, the taxpayers were negligent in that they did not seek to verify the legitimacy of the tax benefits with a source independent of Hoyt); Van Scoten v. Commissioner, T.C. Memo. 2004-275 (participants in Hoyt ventures were negligent in

joining those ventures because they failed to investigate the legitimacy of the ventures with someone independent of those ventures), affd. 439 F.3d 1243 (10th Cir. 2006).

Petitioner knew that the Hoyt organization had labeled any investment in a Hoyt partnership a "speculative investment" and that the Commissioner considered the Hoyt partnerships to be tax shelters that had to be registered and reported as such. Petitioner also knew when he joined TBS 89-1 that the Hoyt organization would be acting with and for him to claim refunds of his Federal income taxes and that he had to pay 75 percent of any tax refund to the Hoyt organization. Petitioner also knew when he joined TBS 89-1 that he could receive preferential tax allocations for any given year simply by asking the Hoyt organization for such allocations. In the light of petitioner's background and his lack of experience and knowledge of the cattle ranching business, and the questionable content of the promotional materials, petitioner was required to perform a meaningful investigation of TBS 89-1 before claiming any tax benefits purportedly flowing therefrom. We find that he did not. While petitioner stresses that he investigated the Hoyt partnerships by visiting the Hoyt operation before and during his participation in TBS 89-1, the fact of the matter is that such visits do not replace the requirement in this case that petitioner have consulted an independent professional adviser

concerning the legitimacy and tax status of the advertised "investment". A reasonable and prudent individual standing in petitioner's shoes would have had ample grounds for suspicion. Moreover, as to petitioner's visits to Hoyt's establishments, we decline to find that petitioner during that time adequately investigated the legitimacy of TBS 89-1. Petitioner never even asked to see, nor did he actually see, any of Hoyt's records concerning TBS 89-1. We conclude that petitioner's failure to investigate properly was inconsistent with what a reasonable and ordinarily prudent person would have done under the circumstances; i.e., it was negligence.

Petitioner did not demonstrate due care in claiming a loss from TBS 89-1 for 1991. In order to prepare his tax return for that year, petitioner supplied the Hoyt organization with all of his tax information (except his reported loss from TBS 89-1), and he allowed the organization to prepare his return by adding to his information a $92,961 loss that purportedly flowed from his participation in TBS 89-1. Notwithstanding the substantial amount of that reported loss, and the fact that it was significantly greater than petitioner's payments to the Hoyt organization,[7] petitioner never took his return to a professional

---

[7] As of the time that petitioner filed his 1991 return, he had paid the Hoyt organization $26,785 and had received $15,987 in tax refunds for 1988, 1989, and 1990 (and was awaiting a refund of $4,053 for 1991). We also note that petitioner's 1988
(continued...)

independent of the Hoyt organization for review.  Accord <u>Hansen</u> <u>v. Commissioner</u>, <u>supra</u> at 1031.  While petitioner attempted to excuse his lack of due care by alleging that he tried but was unable to find such an independent professional, we decline to find this testimony as a fact.  Petitioner's lack of due care for 1991 is further seen by noting that his return claimed a tax refund for that year even though he knew that respondent was investigating at least one of the Hoyt partnerships.

We conclude that petitioner's underpayment of tax for 1991 was the result of negligence.[8]  Thus, petitioner is liable for the 20-percent accuracy-related penalty under section 6662(b)(1) for 1991 unless he meets the section 6664(c) exception for reasonable cause and good faith.

4.  <u>Claimed Defenses to the Accuracy-Related Penalties</u>

a.  <u>Honest Misunderstanding of Fact</u>

Petitioner argues that his underpayments of tax for 1989 and 1991 resulted from an honest mistake of fact because he was defrauded by Hoyt, he had insufficient information concerning his participation in TBS 89-1, and all available evidence supported

---

[7](...continued)
through 1991 returns claimed partnership losses from the Hoyt organization totaling $220,385.

[8] Because we have concluded that petitioner's underpayment of tax for 1991 was attributable to negligence, we do not consider whether the underpayment also was attributable to a substantial understatement of income tax.

Hoyt's assertions. We disagree with petitioner that he had any such misunderstanding of fact as would absolve him from liability for the accuracy-related penalties.

In joining TBS 89-1 and claiming the accompanying losses for 1989 and 1991, petitioner relied exclusively on the assertions made by Hoyt, members of the Hoyt organization, and other participants in the Hoyt partnerships. Petitioner neither verified, nor attempted to verify, any of that information by speaking to someone independent of the Hoyt organization. While Hoyt may have misled petitioner concerning his participation in TBS 89-1, petitioner nevertheless was negligent in not properly investigating Hoyt's claims or otherwise inquiring into the nature of the tax benefits that petitioner claimed on his return with respect to his participation in TBS 89-1. See Keller v. Commissioner, T.C. Memo. 2006-131; Barnes v. Commissioner, T.C. Memo. 2004-266. We conclude that any misunderstanding that petitioner may have had with respect to the facts surrounding his participation in TBS 89-1, and any difficulty that he may have had in obtaining all information necessary to evaluate TBS 89-1 and his participation therein, was not due to an honest misunderstanding of fact such as would constitute a defense to the imposition of the accuracy-related penalties; it was due to a negligent disregard of fact.

b.  Reliance on the Bales Memorandum Opinion

Petitioner argues he had reasonable cause for his underpayments of tax for 1989 and 1991 because he relied on Bales v. Commissioner, T.C. Memo. 1989-568.  We disagree.  In addition to the fact that petitioner by his own admission did not consult an independent professional for advice on Bales, Bales involved different participants, different partnerships, and different years.  Moreover, although petitioner may have read the Bales Memorandum Opinion, we decline to find that he had any understanding of or reliance on that case independent of what was explained to him by the Hoyt organization.  We conclude that any reliance that petitioner placed on Bales was not reasonable.[9] See Hansen v. Commissioner, 471 F.3d at 1032-1033; Mortensen v. Commissioner, 440 F.3d 375, 391-392 (6th Cir. 2006), affg. T.C. Memo. 2004-279; Sanders v. Commissioner, T.C. Memo. 2005-163.

---

[9] Petitioner argues that he acted reasonably in that this Court was unable to uncover Hoyt's fraud and petitioner was in no better position to evaluate the legitimacy of his participation in TBS 89-1 or the tax benefits claimed therefrom.  Petitioner is misfocused in making this argument.  The argument relates improperly to the question (irrelevant herein) of whether petitioner could or should have uncovered the fraud, rather than to the relevant and decisive issue of whether he was negligent in not adequately investigating the partnership and/or seeking qualified independent advice concerning it.  See Hansen v. Commissioner, 471 F.3d at 1032-1033; Mortensen v. Commissioner, 440 F.3d at 389-390.

c.  <u>Conclusion</u>

We conclude that petitioner did not have reasonable cause for his underpayments of tax for 1989 and 1991.  Accordingly, we hold that petitioner is liable for a section 6662(h) accuracy-related penalty for 1989 and a section 6662(a) accuracy-related penalty for 1991, both in the amounts alleged by respondent in his answer.[10]

_____

We have considered all arguments made by petitioner for holdings contrary to those expressed herein, and we conclude that those arguments not discussed herein are either irrelevant or without merit.

<u>Decision will be entered</u>

<u>for respondent</u>.

_____

[10] As to the amounts of these accuracy-related penalties, we have reviewed respondent's computations of the amounts set forth in his answer and find them to be correct.